UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 22-66 |
| v. | * | SECTION: G |
| KIRILL KOMPANIETS | * | |

\* \* \*

## FACTUAL BASIS

The United States of America and the defendant, Kirill Kompaniets (KOMPANIETS), hereby agree that this Joint Factual Statement is a true and accurate statement of the defendant's criminal conduct, that it provides a sufficient basis for the defendant's plea of guilty to the charges contained in the Criminal Bill of Information in the above-captioned matter and as set forth in the Plea Agreement signed this same day. The defendant agrees that had this matter proceeded to trial, the United States would have proven the facts contained in this Joint Factual Statement beyond a reasonable doubt. The following are not all of the facts known to the defendant and the government, but are sufficient to support the defendant's guilty plea.

### Background

KOMPANIETS was the Chief Engineer of the *M/V Gannet Bulker*, a foreign-flagged bulk carrier registered in the Marshall Islands. On or about March 11, 2021, the 623-foot long, 33,045 gross ton ship arrived in the Port of New Orleans for the purpose of picking up cargo.

On March 14, 2021, a crew member aboard the vessel messaged the U.S. Coast Guard *via* a social media application and alleged that the engine room of the ship had flooded, and that starting on March 13, 2021, the resulting oil-contaminated bilge water had been deliberately pumped overboard in U.S. waters through equipment and procedures that bypassed the ship's

<div style="text-align: right;">AUSA<br>Defendant<br>Defense Counsel</div>

required pollution prevention equipment. At the time, the ship was located at anchorage in the Southwest Passage of the Port of New Orleans near the mouth of the Mississippi River and within the navigable waters and territorial sea of the United States.

In sum and substance and as set forth herein, the Coast Guard conducted an inspection of the ship at the anchorage off the South West Pass. In pleading guilty, and as detailed herein, KOMPANIETS acknowledges that he was aware that the ballast water system was not working as designed, that an internal leak flooded the engine room resulting in an dangerous condition, that these hazards had not been reported to the Coast Guard, that he and a subordinate engineer deliberately pumped overboard the oil-contaminated waste that collected in the bilges, and that he engaged in various acts of obstruction of justice taken in concert with other crew members in order to conceal the flooding and subsequent act of intentional pollution.

The defendant discharged oily bilge water on March 13-14, 2021, into U.S. waters using an emergency fire pump without the use of required pollution prevention equipment (i.e., without the use of an Oily Water Separator and Oil Content Monitor). As part of his guilty plea, the defendant admits that the amount accumulated in the bilges and discharged overboard was approximately 39 cubic meters and may have been more. No entry was made in the Oil Record Book indicating that any overboard discharge had occurred. Further, neither the hazardous condition that caused the leak nor the hazardous flooding of the engine room were reported to the U.S. Coast Guard as required by the Ports and Waterways Safety Act, 46 U.S.C. § 70036(b)(1) and 33 C.F.R. §§ 160.202, 203(a)(2), and 216. The internal flooding of the engine room resulted in a dangerous condition. The emergency had been stabilized before KOMPANIETS discharged

AUSA
Defendant
Defense Counsel

the oily bilge water overboard. No arrangements were made to use other storage space to retain the waste on board the ship.

### Flooding of the Engine Room

The *M/V Gannet Bulker* had experienced difficulties for some time with the ballast water treatment system (BWTS) and specifically, with de-ballasting and removing or stripping ballast water from certain tanks. Removing the water in ballast tanks is essential to ballasting operations, as well as to conducting an exchange of ballast water in accordance with U.S. and international rules designed to ensure that invasive species are not transported from one jurisdiction to another.

Prior to its arrival in New Orleans, the owner and operator of the *M/V Gannett Bulker* and the ship's crew planned to replace certain valves on the ballast water system once the ship arrived in New Orleans. On March 13, 2021, the Defendant and his crew attempted to replace certain valves. However, the valves provided to the ship were not the correct size and could not be installed. On the same date, because of ongoing problems with stripping system, and at the request of the Master and Deck Department, Defendant and his crew opened a valve for the purpose of determining whether it was clogged with debris. When partially opened it exploded and flew across the engine room. An uncontrolled fountain of water under great force began spewing into the engine room and filling up the ship's bilges. The flooding was stopped in approximately 30 minutes.

By the time the valve was closed again, the bilge spaces were largely filled. The ballast water mixed with waste oil in the bilges and oil sheens could readily be seen floating on top of the bilge water. The uncontrolled leak and resulting flooding was initially life-threatening to the crew and posed a serious threat to the safety of the ship. Engine room flooding can result in electrocution

3

AUSA
Defendant
Defense Counsel

and loss of power, including inability to steer a vessel. Once the leak was stopped, all but one member of the engineering crew left the engine room and went to dinner and/or to sleep.

<p align="center">Deliberate Discharge Made in Violation of APPS/MARPOL</p>

KOMPANIETS was present in the engine room and witnessed the influx of water first-hand. Neither the valve failure nor the flooding of the engine room was reported to the Coast Guard as required. Oil was visible on the surface of the bilge water. Having stopped the internal flooding, the ship was required to either store the oil-contaminated bilge waste in onboard tanks for future processing to remove the oil, or to offload the waste in port to a barge or tank truck for proper disposal.

At approximately 10:00 – 10:45 p.m. that night, KOMPANIETS and a subordinate engineer under his command and acting at his direction returned to the engine room to repair he valve and then pumped the majority of the bilge water that had collected in the bilges overboard into the navigable waters of the United States using an emergency fire pump and related emergency discharge system. The overboard discharge did not pass through the Oily Water Separator and Oil Content Monitor and it was not recorded in the Oil Record Book. The U.S. Coast Guard was not informed about the flooding of the engine room or overboard discharge. Approximately 39 cubic meters (10,303 gallons) was intentionally dumped overboard. KOMPANIETS knew that the discharge overboard was polluted and contained oil. The deliberate discharge overboard was made in violation of the Act to Prevent Pollution from Ships and MARPOL because it was done without the use of the oily water separator and oil content monitor. At the time of the discharge, the ship was at an anchorage near the Southwest Pass off the coast of New Orleans and within U.S. navigable waters and territorial sea.

AUSA
Defendant
Defense Counsel

Obstruction of the Coast Guard Inspection

On March 15, 2021, after receiving an allegation from a crew member ("the whistleblower") that the *Gannet Bulker* had discharged oil-contaminated bilge water into U.S. waters, the Coast Guard issued a Notice of Federal Interest[1] to the vessel. The ship's commercial agent alerted the company of the notice and also that the Coast Guard would be conducting an inspection. The whistleblower informed a supervisor that he was responsible for contacting the Coast Guard because he objected to the intentional pollution of the environment. This information was passed on to KOMPANIETS. The identity of the whistleblower onboard the ship was not a secret.

During the inspection, the Coast Guard examined the Oil Record Book and asked to speak with the Chief Engineer. KOMPANIETS stated that there was a problem with the installation of new valves and that one had leaked a small amount. KOMPANIETS falsely stated that only 2 cubic meters of bilge water had spilled inside the ship. He stated that it had been pumped from the bilges into the bilge holding tank where it was stored. KOMPANIETS directed the inspectors to examine the ship's Oil Record Book if they had any questions, stating that he had already provided the information in the log. KOMPANIETS signed an Oil Record Book entry stating that 2 cubic meters of bilge water had been transferred from the bilges to the bilge holding tank between 20:30 to 20:55 hours on March 13, 2021. The Oil Record Book contained no entry about the accumulation of water in the ship's bilges or the overboard discharge of the oil-contaminated bilge water into U.S. waters without the use of pollution prevention equipment. When asked if the

---

[1] A Notice of Federal Interest provides potentially responsible parties with the opportunity to clean up an oil spill rather than reimburse the government for any cleanup efforts. No notice or cleanup took place.

AUSA
Defendant
Defense Counsel

engineering computer would show the times that the pumps were used, the KOMPANIETS stated that he was an engineer and did not know that much about computers.

At various times before and during the inspection KOMPANIETS told subordinate engineers and crew members to minimize the amount of fluid that had spilled into the bilges and they followed this instruction. Based on the capacity of the bilge compartments and photographs obtained from the whistleblower, the Coast Guard determined that it was far more. The Coast Guard readily observed an oily scum line at the top of the bilges that marked the level the water had risen.

During the ship's continuing inspection and detention, KOMPANIETS held multiple meetings in his cabin with members of the engineering crew, except for the whistleblower. Another conversation took place on the bridge wing of the ship immediately prior to the crew disembarking. In these meetings, KOMPANIETS reiterated the request that subordinate crew members should stick with the same false story that there had been a minimal spill into the bilges that was intended to obstruct the Coast Guard inspection and conceal the cause of the spill and the fact that bilge water had been discharged overboard in U.S. waters. Neither KOMPANIETS nor any other person informed the Coast Guard prior to the ship's departure that the leak into the bilges came from a a ballast tank. KOMPANIETS was aware that the Coast Guard had not been informed of and did not understand the cause or source of the leak, and that had the agency been so informed, that it could adversely impact the ability of the ship to depart port without further investigation and/or repairs. KOMPANIETS also stated to others that the whistleblower was to blame for the leak even though he knew that this was not true.

AUSA
Defendant
Defense Counsel

KOMPANIETS obstruction of justice also involved the destruction of evidence. KOMPANIETS ordered that the bilge spaces be cleaned before the Coast Guard inspection. In anticipation of the Coast Guard inspection, KOMPANIETS further directed a subordinate engineer to remove and conceal the printout of engine room alarms from the engine control room printer. When asked by the Coast Guard about the printout from the computer that would show equipment alarms during the time in question, KOMPANIETS claimed not to know what happened to the missing printout. KOMPANIETS also instructed another engineer who was present when the alarm printout was removed not to disclose this destruction of evidence. In pleading guilty, KOMPANIETS acknowledges that the alarm printout was removed, concealed and destroyed as a direct result of his orders and that the purpose was to prevent the Coast Guard from learning the truth about the ship's problems and the overboard discharge in U.S. waters.

KOMPANIETS also directed subordinate engine room employees to delete all photographs and communications from their cell phones regarding the internal spill in anticipation that the phone would be seized by the U.S. Coast Guard.

On March 18, 2021, Coast Guard inspectors conducted additional interviews. In his interview with the Coast Guard, KOMPANIETS denied knowledge of any overboard discharge and acted in an obstructive manner. Also on March 18, 2021, the Guard was provided with disciplinary papers concerning the whistleblower. KOMPANIETS helped to create these documents and urged subordinate crewmembers to co-sign them at a meeting held with the Master on March 18, 2021. One of the memos signed on March 18, 2021, was dated March 14, 2021. In pleading guilty, KOMPANIETS acknowledges that one of the disciplinary documents was

AUSA
Defendant
Defense Counsel


...

intended in part to discredit the whistleblower and to retaliate against him for contacting the U.S. Coast Guard and exposing the illegal conduct on board the ship.

## Addendum

As part of an agreement between the Coast Guard and the ship owner and operator, KOMPANIETS and certain other crew members remained in New Orleans after the ship departed the United States. KOMPANIETS agreed to be interviewed early in the government's investigation and admitted to his involvement in the discharge, falsification of records and obstruction of justice. According to KOMPANIETS, the Master was aware of the repair to the valve that leaked and was present in the engine room during the flooding incident. This was corroborated by other witnesses. According to KOMPANIETS the Master directed that the bilges be dumped overboard at night. Another engineer overheard some portion this conversation. According to KOMPANIETS, some portion of the oily bilge water containing visible oil and other debris were retained on board. When he learned that that the ship was to be inspected by the Coast Guard, and at the direction of the Master, KOMPANIETS directed that the bilges be cleaned up and the remaining oil and other debris were pumped to a waste oil tank and cleaned up with rags. When the Coast Guard initially boarded the ship, an oily scum line remained visible in the bilges showing that they had been filled with oily water.

According to KOMPANIETS, his obstructive acts were consistent with what he understood to be the Master's wishes. KOMPANIETS' concealment of computer printout of alarm data, false statements made to the Coast Guard (e.g., minimizing the volume leaked into the bilges, denying an overboard discharge), and falsely suggestions to crew members that the whistleblower may

AUSA
Defendant
Defense Counsel

have been to blame for any discharge, were all done at the direction of the Master, according to KOMPANIETS.

**APPROVED AND AGREED TO:**

_____       5/18/22
G. DALL KAMMER                            Date
Assistant United States Attorney

_____       5/18/22
RICHARD A. UDELL                      Date
Senior Litigation Counsel
Environmental Crimes Section

_____       5/18/22
WALTER BECKER                              Date
Attorney for Kirill Kompaniets

_____       5/18/22
KIRILL KOMPANIETS                   Date
Defendant